Robert H. ALLPHIN, Commissioner of
Revenue, Commonwealth of Kentucky
et al., Movants,

v.

Robert J. BUTLER, Jr., Property
Valuation Administrator, Jefferson
County, et al., Respondents.

Supreme Court of Kentucky.

May 26, 1981.

Nathan Goldman and William S. Riley,
Legal Division, Dept. of Revenue, Frank-
fort, for movants.

William E. Scent and James R. Higgins,
Jr., Wyatt, Tarrant & Combs, Louisville, for
respondents.

LUKOWSKY, Justice.

This case began in May, 1980 when a
majority of Kentucky's property valuation
administrators (PVAs) refused to follow a
directive from the Department of Revenue
(Department) to increase their assessments
of real property in their respective counties
to correspond to the Department's estima-
tion of the fair cash value of that property.
The Department threatened to withhold the
PVAs' salaries to force compliance with its
directive. The PVAs sought relief in the
Franklin Circuit Court, which declared that
the Department's directive was "wrongful
and illegal" and permanently enjoined the
Department from withholding the PVAs'
paychecks. The Court of Appeals affirmed.
We reverse.

On or before the first Monday in
May, 1980 the PVAs submitted recapitula-
tions or summaries of the aggregate value
of real property by class in their counties to
the Department pursuant to KRS 133.-
040(1). Thereafter the Department notified

the PVAs that, "based on the relationships between assessed valuations and actual sale prices," their assessments were "not in compliance with the full fair market value requirements of the constitution and the courts."[1] The Department directed the PVAs to raise the aggregate assessed values by minimum increases to make them satisfy the requirement of fair cash value. The Department sent these directives pursuant to KRS 133.040(1). The PVAs refused to follow them. The Department ordered that their paychecks be withheld until they complied. KRS 132.690(3).

The PVAs contend that once they submit their recapitulations, assuming they have assessed property in good faith, they do not have to reassess the property in their counties to increase its value to agree with the figures determined by the Department. They further argue that if the Department is dissatisfied with their assessments, then it is the Department's job to reassess each county's property. In general terms, this case involves the relationship between Kentucky's PVAs and the Department of Revenue. Specifically, it raises the issue whether the Department has the authority to direct the PVAs to correct their assessments of real property after the PVAs submitted their recapitulations to the Department.

In 1891 the drafters of our constitution provided for the election of an assessor in each county, but also empowered the General Assembly to abolish the office and require the assessment of property be made by other officers. Ky.Const. Secs. 99 and 104. Accordingly, our legislature eventually replaced the office of assessor with the position of property valuation administrator and provided that PVAs be elected in each county every four years. KRS 132.370(1)

and (2). PVAs are state officers serving both the Commonwealth and their respective counties. *Talbott v. Burke*, 287 Ky. 187, 152 S.W.2d 586 (1941). Their duties are detailed in KRS Chapters 131, 132 and 133. Their primary duties are to make the assessment of all property in their counties and to prepare property assessment records. KRS 132.420. Furthermore, they must assess all property at its fair cash value. KRS 132.450.

The PVAs do not perform their duties independently. In addition to working with various county officials, the PVAs must work with the Department of Revenue. The relationship between the PVAs and the Department is defined in bits and pieces throughout KRS Chapters 131, 132 and 133. A review of a few of these statutes should be sufficient to appreciate the nature of this relationship:

A. KRS 131.130(1): "The Department may make rules and regulations, and direct proceedings and actions, for the administration and enforcement of all tax laws of this state."

B. KRS 132.420(1): "The [PVA] shall, subject to the directions, instructions and supervision of the Department of Revenue, make the assessment of all property in his county . . . ."

C. KRS 132.690(1): "Each parcel of taxable real property . . . shall be revalued during each year of each term of office by the [PVA] at its fair cash value in accordance with standards prescribed by the Department of Revenue. . . ."

Obviously, the PVAs do not function in a vacuum, but are aided by and answerable to the Department.[2] This legislative scheme

---

1. Section 172 of the Constitution of Kentucky requires that all property be assessed for taxation at its fair cash value, estimated at the price it would bring at a fair voluntary sale. In *Russman v. Luckett*, Ky., 391 S.W.2d 694 (1965) we stated the obvious, that this means that property must be assessed at 100% of its cash value.

2. The PVAs are firmly fixed on the horns of a dilemma. They are elected by their constitu-

ents who are taxpayers and they are accountable to the Department which is a tax collector. They are elected officials and department employees. *Salmon Corp. v. Kentucky Board of Tax Appeals*, Ky., 426 S.W.2d 473, 475 (1968). Perhaps at times this position makes them feel like Odyseus facing Scylla and Charybdis, but nothing in the record indicates that the PVAs here were unaware of the paradoxical nature of the job for which they chose to run.

provides the PVAs with no excuse for failure to comply with the Department's directives.

In addition, the PVAs violated the specific mandate of KRS 133.040 by refusing to raise the aggregate assessments of their counties' real property to meet the Department's estimation of its value. The Department arrived at its figures by using a method involving sales-assessment ratio studies.[3] In laymen's terms the Department reviewed the sales of real estate in each county from the previous year to determine the valuation of all property as of January 1 of the taxing year. The PVAs do not object to this method. They disagree with the results of the method, viz., the Department's estimations, which are higher than their assessments. Because they contend that they arrived at their valuations in good faith, they believe that when the Department rejected their assessments then the Department itself was required to reassess the property to correspond to its own valuations. Not so, the legislature has not seen fit to give them the right to ignore the Department's figures.

KRS 133.040 is unambiguous. It states: "The [PVA] shall complete the tax roll of all property in his county before the first Monday in May of each year in accordance with law, and on or before that date he shall file with the department of revenue ... a recapitulation of all property assessed on said tax roll .... Within thirty (30) calendar days after receiving the recapitulation the department of revenue shall direct the property valuation administrator to make any changes that are necessary to correct the assessment ...." The Department's mandate is explicit. It has no choice when the PVAs' assessments are different from its valuations. It must order the PVAs to correct them. Implicit in this mandate, especially when viewed in light of the Department's general supervisory powers, is the correlative requirement that the PVAs follow the Department's directives.

The basis of the PVAs' argument that the mandate of KRS 133.040 does not apply

to them is that their duty to correct their assessments is superseded by the department's ability to assess property as provided in KRS 133.150. A close look at this statute reveals that it neither relieves the PVAs of following the Department's directives nor restricts the Department to achieving fair cash value assessments only pursuant to its terms. Although the statute gives the Department the power to reassess property, especially when read in the context of its companion statutes KRS 133.160 and KRS 133.170, it is but one weapon in the Department's arsenal to assure that the requirement found in Section 172 of our constitution is met. Apparently the legislature did not want to require the Department to use a sledge-hammer to swat a gnat.

We reiterate that the Department and the PVAs are both mandated to assess all property in Kentucky at its fair cash value. The statutory scheme set out by the legislature in KRS Chapters 131, 132 and 133 contemplates a team effort. But there is no doubt that the Department is the team leader. No other conclusion is reasonable because the legislature has armed the Department not only with general supervisory powers over the PVAs, but also with specific controls to force the PVAs to comply with its directives. KRS 132.690(3) and KRS 132.370(4).

As part of the team the PVAs have the initial responsibility of assessing real property at its fair cash value for taxation. As team leader the Department has the ultimate responsibility of achieving this goal. If the Department disagrees with the PVAs' assessments, the legislature has empowered it to direct the PVAs to correct the assessments and to withhold their paychecks if they don't. KRS 133.040; KRS 132.690(3) and *Luckett v. Monson*, Ky., 465 S.W.2d 719 (1971). The legislature has also authorized the Department to assess real property in Kentucky, KRS 133.150; KRS 132.660 and KRS 132.330. This arms the Department with a variety of weapons to accomplish its task, i. e., promptly, efficient-

---

3. See generally KRS 133.250(1) and (2), effective July 15, 1980.

ly and economically assure that all property is assessed at its fair cash value. The legislature has seen fit to leave the choice of weapons to the discretion of the Department.

Consequently, the PVAs' refusal to follow the Department's directive should not have been sanctioned on the basis that their responsibilities ceased upon submission of their recapitulations to the Department. The Department acted within the authority and discretion granted it by the legislature to direct the PVAs to correct their assessments and to withhold their paychecks for noncompliance.

■ We have answered the sole question presented and ordinarily would stop here. However, we believe it necessary to continue because the PVAs, the Circuit Court and the Court of Appeals injected an element into the case which is not relevant—the plight of the taxpayer. Overlooking their lack of standing to assert the rights of the taxpayers, the PVAs argue that their compliance with the Department's directive would adversely affect the taxpayers' ability to protest increases in the assessment of their property. This argument is based on the following statutory timetable:

A. The PVAs must submit their recapitulations to the Department by the first Monday in May. KRS 133.-040(1).

B. The Department has 30 days to review the recapitulations and notify the PVAs of any necessary corrections to be made. KRS 133.040(1).

C. Any taxpayer whose property has been assessed at a greater value than in the previous year must be notified by first class mail. KRS 132.450(4).

D. Any taxpayer who wishes to protest the increase in his assessment must file a letter or petition with the county clerk during the period in which the tax roll is open for inspection. KRS 133.130(1).

E. This inspection period begins on the fourth Monday in May and runs for twelve days. KRS 133.045, effective June 15, 1980. (In 1980 the inspection period opened on the first Monday in June and ran for five days.)

F. The Board of Assessment Appeals convenes on the second Monday in June to review taxpayers' protests. KRS 133.030.

Hypothetically if the PVAs wait until the last minute to submit their recapitulations and the Department waits until the last minute to direct the PVAs to correct the assessments, the inspection period will have begun before the PVAs can make the necessary increases and notify the taxpayers. We recognize that the legislature may not have laid out a perfect schedule. However, we do not believe that it facially violates the taxpayers' rights to protest their assessment increases because the legislature has provided for an extension of the inspection period in KRS 133.045(1).[4] Ideally, the PVAs and the Department will work together to assess property at fair cash value so that taxpayers can be notified of any increases prior to the commencement of the regular or extended inspection period. If a taxpayer does not have an adequate opportunity to protest his assessment, then he may have a legitimate complaint. At that time he may take the necessary legal action to protect his rights. That is a matter for another case and need not be addressed here.

The decision of the Court of Appeals and the judgment of the trial court are reversed and the cause is remanded to the Franklin Circuit Court for entry of a judgment consistent herewith.

All concur except CLAYTON, STEPHENS and STEPHENSON, JJ., who dissent.

CLAYTON, Justice, dissenting.

As in the companion case of *Parrent v. Fannin*, decided this same day, I agree with the circuit court and the Court of Appeals.

---

4. Tax revenue equals rate of taxation times assessment for taxation. Because of the restrictions imposed on tax revenue increases by KRS 132.020 through 132.028, the effect of increases in assessments will ordinarily be softened by reductions in rate.

As the majority opinion points out, the PVAs submitted their recapitulations of the aggregate value of property in their counties on or before the first Monday in May 1980. The Department then ordered the PVAs to raise the submitted assessments under penalty of having their salaries withheld pursuant to KRS 132.690. The dispositive issue becomes whether the Department has the statutory power to reject the tendered assessments.

The gist of the PVAs' argument is that the Department lacks such power after the PVAs have performed the duties of their office in good faith. Their statutory responsibilities dictate that, "The property valuation administrator shall, subject to the direction, instruction, and supervision of the department of revenue, make the assessment of all property in his county . . . ." KRS 132.420. The PVAs act under a constitutional mandate to assess the property in their counties at fair market value. Ky. Const., § 172; *Russman v. Luckett*, Ky., 391 S.W.2d 694 (1965).

The Department, on the other hand, contends that it has the authority to reject the assessments under its general supervisory powers. KRS 131.130 provides that, "The department may make rules and regulations, and direct proceedings and actions, for the administration and enforcement of all tax laws in this state."

The intended purpose of the statutes in question is to delegate the powers to regulate the assessment of property for tax purposes. The elected PVAs have the specific duty to assess property subject to the department's general powers of supervision. Where two or more statutes deal with a common subject matter, the more specific enactment prevails over the general statute. *Morton v. Auburndale Realty Company*, Ky., 340 S.W.2d 445 (1960).

The Department further agrees that it has the power to reject the recapitulations under its authority to correct assessments contained in KRS 133.150–133.170. These statutes merely provide the power to correct assessments to guarantee equalization among the counties. The statutory require-

ment of equalization does not authorize the department to raise assessments after the PVAs, in good faith, have submitted their computations. *See Ballard County v. Citizens State Bank of Wickliffe*, Ky., 261 S.W.2d 420 (1953).

A compatible balance must be reached under which the PVAs acquire at least some autonomy in order to function in their elected offices. Otherwise, their positions become meaningless. The majority opinion characterizes the parties as a "team" in which the department acts as a "team leader." On the contrary, the practical effect of the court's decision is to eject the PVAs from the team altogether.

I would affirm the judgment of the trial court and the decision of the Court of Appeals.

STEPHENS, Justice, dissenting.

I respectfully dissent.

I do not disagree with the majority's general description of the relationship of the department of revenue and the locally elected property valuation administrator. Nor do I disagree with the obvious constitutional mandate that all property within this Commonwealth be assessed at fair cash value.

However, I have a strong parting of the ways with the majority's interpretation of the statutory scheme setting up the procedure when one or more local PVAs disagrees with the department of revenue as to the local assessment.

The argument of the PVAs is that when there is a bona fide disagreement as to an assessment, the department of revenue has the duty to make its own assessment. KRS 133.150, *et seq*. In disagreeing, the majority hangs its hat on KRS 133.040. That statute, after directing the PVA to complete the "tax roll of all property in his county," requires that the PVA shall file a recapitulation of it with the department of revenue. Within 30 days after receiving it, "the department of revenue shall direct the PVA to make changes that are necessary to correct the assessment."

The majority says that this statute requires the department of revenue to "order the PVAs to correct" local assessments when such differs with that of the department. Extending the logic of this interpretation, the department would be required to mandate the assessment of the PVA to be changed if the department's assessment were lower, or higher. Such mandated changes would be made even if the department's figures were arrived at improperly, were illegal, arbitrary and capricious. Under this view, a local PVA could be required to answer, in court, for the possible illegal or bad faith acts of a department of revenue official. I suggest that the general assembly of Kentucky never intended such a situation.

KRS 133.150, 133.160 and 133.170 provide the legislature's simple answer to a situation where there is an honest disagreement between the department of revenue and the PVA.

The "department of revenue shall have power to increase or decrease the aggregate assessed valuation of the property of any county or taxing district thereof ... (t)he *department of revenue shall fix the assessment of all property at its fair cash value* ...." KRS 133.150 (emphasis added). This unequivocally requires the department to make its own assessment.

KRS 133.160 then provides a specific, detailed procedure whereby the affected county shall be notified of the reassessment action of the department.

"Notice of assessment raised by department—To whom given—Contents.—When it is contemplated by the department of revenue that it will be necessary to raise the assessed valuation of property in any county, it shall give notice of the contemplated action to the county judge/executive, the superintendent of any school district affected by such action, the mayor of any city which is affected and which has adopted the assessment, and to the taxpayers of that county through the county judge/executive, who shall pose the notice sent him on the courthouse door and certify to the department of revenue that this has been done, and it shall fix a time and place for a hearing which may be in Frankfort or any convenient place in or nearer the county seat."

The majority finesses the clear impact of these statutes by saying that they do not relieve the PVA of following the department's directives and that they do not restrict the department from achieving fair cash value assessments solely pursuant to their terms. KRS 133.150, *et seq.*, are described as "one weapon in the department's arsenal." I cannot believe that the procedure set out in KRS 133.150, 133.160 and 133.170 is a "weapon" of enforcement. It is, rather, a mandate of the legislature requiring the department of revenue to make its own assessment. The other methods of enforcements described in the majority opinion, viz., KRS 132.690(3), 132.370(4), and *Commonwealth ex rel. Luckett v. Monson*, Ky., 465 S.W.2d 719 (1971), are more than sufficient to enforce the department of revenue's power over the local PVAs.

I believe that in a case of an honest difference of opinion, in a case of good faith disagreement, the legislature, by enacting KRS 133.150, mandated that the department of revenue make its own assessment. The detailed procedure set out in KRS 133.160 corroborates this view. Would the legislature do a vain act in enacting these statutes? Would it have been guilty of overkill in providing another "weapon" to hammer the PVAs? I believe not.

In the oral argument before us, counsel for the department of revenue stated that the enforcement procedures previously described were sufficient to carry out the authority set out in KRS 133.040. He stated that KRS 133.150, 133.160 and 133.170 were "too expensive and too cumbersome for the department." Very candidly, counsel admitted that, as a practical matter, the procedure established by the legislature in KRS 133.150, *et seq.*, was "impractical and couldn't be done."

This statutory scheme was established by the legislature of the Commonwealth. It is not for this court to determine its cost, its

practicability or, indeed, its wisdom. It is our duty to effectuate it. Counsel's argument, to me, is tantamount to a concession that the procedure is proper and appropriate in this case. If the department of revenue has the facilities and expertise (and the legislature has said that it does) to develop an assessment in each of the 120 counties of this Commonwealth, it certainly has the ability to make its own assessments pursuant to KRS 133.150, *et seq.*

I would affirm the Court of Appeals and direct that the department of revenue make its own reassessment, following the procedure set out by statute.

STEPHENSON, J., joins in this dissent.